DAN RHYNE AND ALICE RHYNE v. K-MART CORPORATION, SHAWN ROBERTS, AND JOSEPH HOYLE

No. 522A02

(Filed 2 April 2004)

**1. Constitutional Law— North Carolina—statutory limitation on punitive damages—separation of powers**

N.C.G.S. § 1D-25, which places a limitation on the award of punitive damages, is not violative of the constitutionally mandated separation of powers doctrine because: (1) under North Carolina law, a trial court's power to remit damages is not necessarily inherent as that exercise of power is specifically authorized and limited by N.C.G.S. § 1A-1, Rule 59(a)(6); (2) N.C.G.S. § 1D-25 does not operate as a legislative remittitur when it does not grant the General Assembly the authority to remit excessive awards on a case-by-case basis, but instead imposes a limit on the recovery of punitive damages in all cases; (3) N.C.G.S. § 1D-25 does not represent an impermissible interference with the judiciary's constitutionally defined authority since our Constitution neither expressly nor implicitly empowers our courts to award punitive damages or to remit excessive awards thereof; (4) N.C.G.S. § 1D-25 is a modification of the common law within the General Assembly's policy-making authority to define legally cognizable remedies; (5) if the legislative branch can abolish plaintiffs' right to recover punitive damages altogether, a right which has not vested and is not guaranteed by the state Constitution, it can surely place limitations on the recovery of punitive damages; (6) the General Assembly has similarly modified other portions of our common law without violating the North Carolina Constitution; and (7) legislatures have extremely broad discretion in defining criminal offenses, and thus, also enjoy broad discretion in authorizing and limiting permissible punitive damages awards.

**2. Constitutional Law— North Carolina—statutory limitation on punitive damages—right to a trial by jury**

N.C.G.S. § 1D-25, which places a limitation on the award of punitive damages, is not violative of plaintiffs' right to a trial by jury as guaranteed by the North Carolina Constitution because: (1) the right to trial by jury applies only to actions respecting property and although Article I, Section 25 appears to embody a

broad definition of the term "property," a controversy in which punitive damages are assessed is not one which enforces a plaintiff's legal rights, and therefore, does not respect property; (2) an entitlement to an award of punitive damages does not represent a right vested in a plaintiff because such damages are assessed solely as a means to punish the willful and wanton actions of defendants; and (3) plaintiffs have no independent right to or property interest in an award of punitive damages, and as such, the jury's role in awarding punitive damages can be dictated by the General Assembly without violating plaintiffs' constitutional right to a trial by jury.

**3. Constitutional Law— North Carolina—statutory limitation on punitive damages—taking of property**

The limitation on punitive damages under N.C.G.S. § 1D-25 does not constitute an unconstitutional taking of property even though plaintiffs contend they were denied the enjoyment of the fruits of their own labor in not receiving the amount of punitive damages as awarded by the jury, because: (1) Article I, Section 1 of our Constitution does not specifically guarantee to the citizens of North Carolina that their property will not be taken without just compensation; (2) the jury's verdict was not property in which plaintiffs enjoyed a vested right; (3) the limitation on punitive damages applies prior to the entry of judgment, a point at which it could be argued that plaintiffs obtain a vested property right in the verdict; and (4) a litigant's participation in a trial is not "labor" nor is a jury's verdict the "fruits" of that labor.

**4. Constitutional Law— North Carolina—statutory limitation on punitive damages—due process—equal protection**

The limitation on punitive damages under N.C.G.S. § 1D-25 does not violate due process and equal protection principles under Article I, Section 19 of the North Carolina Constitution, because: (1) the statute bears some rational relationship to several legitimate governmental interests including preserving North Carolina's economic development given the impact of punitive damages on a variety of industries, assuring public confidence in the judicial system, providing clear notice of possible penalty to defendants whose property would potentially be taken without the protection of our criminal justice system, promoting public confidence in and bringing more certainty to our system of civil redress, shielding North Carolina from problems encountered in other states, and encouraging businesses to bring much needed

employment and other economic resources to this state; and (2) the monetary limits established by N.C.G.S. § 1D-25 providing for three times the compensatory award are not arbitrary and are in line with the standards suggested by the United States Supreme Court to prevent grossly excessive awards.

**5. Constitutional Law— North Carolina—statutory limitation on punitive damages—Open Courts Clause**

The limitation on punitive damages under N.C.G.S. § 1D-25 does not violate the Open Courts Clause of our state Constitution under Article I, Section 18, because: (1) our Supreme Court has already concluded that the Open Courts Clause does not prevent the General Assembly from abolishing the recovery of punitive damages altogether, and thus, it follows that it does not prevent the General Assembly from limiting awards of punitive damages; and (2) the Open Courts Clause is not implicated since plaintiffs do not have a right to recover punitive damages.

**6. Constitutional Law— statutory limitation on punitive damages—vagueness**

The limitation on punitive damages under N.C.G.S. § 1D-25 is not void for vagueness, because rules of statutory construction can be applied to discern a meaning from N.C.G.S. § 1D-25 that can be uniformly administered.

**7. Damages and Remedies— statutory limitation on punitive damages—per plaintiff**

N.C.G.S. § 1D-25 applies to limit recovery of punitive damages per plaintiff, not per defendant, even where multiple plaintiffs are joined together in one suit. Therefore, the Court of Appeal properly determined that each of the two plaintiffs in the instant case should receive $250,000, requiring defendant to pay a total of $500,000 in punitive damages.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 149 N.C. App. 672, 562 S.E.2d 82 (2002), affirming a memorandum of opinion and judgment and an order, both entered 17 May 2000 by Judge Richard D. Boner in Superior Court, Gaston County. On 27 March 2003, the Supreme Court retained plaintiffs' notice of appeal as to a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1) and allowed defendant K-Mart Corporation's petition for discretionary review as to an additional issue. Heard in the Supreme Court 9 September 2003.

**RHYNE v. K-MART CORP.**

[358 N.C. 160 (2004)]

*Center for Constitutional Litigation, P.C., by Robert S. Peck, pro hac vice; Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, P.A., by William E. Moore, Jr.; and Arcangela M. Mazzariello, for plaintiff-appellees and -appellants.*

*Alston & Bird LLP, by James C. Grant, pro hac vice; and Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr. and Sean E. Andrussier, for defendant-appellees and -appellants.*

*Patterson, Harkavy & Lawrence, L.L.P., by Burton Craige, on behalf of the North Carolina Academy of Trial Lawyers; North Carolina Friends of Residents in Long Term Care, Inc.; American Civil Liberties Union Legal Foundation of North Carolina; and North Carolina Justice and Community Development Center, amici curiae.*

*Smith Moore, LLP, by J. Donald Cowan, Jr. and Lisa Frye Garrison, on behalf of the Product Liability Advisory Council, Inc., amicus curiae.*

*Shook, Hardy & Bacon, L.L.P., by Bruce O. Jolly, Jr., on behalf of the American Tort Reform Association and the National Association of Manufacturers, amici curiae.*

*Moore & Van Allen, by George M. Teague; and North Carolina Retail Merchants Association, by Andrew Ellen, General Counsel, on behalf of the North Carolina Citizens for Business and Industry, amicus curiae.*

*Helms Mulliss & Wicker, PLLC, by Robert H. Tiller; and Robbins, Russell, Englert, Orseck & Untereiner, LLP, by Alan E. Untereiner, pro hac vice, on behalf of the Chamber of Commerce of the United States, amicus curiae.*

*Boyce & Isley, PLLC, by Philip R. Isley; and Washington Legal Foundation, by Paul D. Kamenar, pro hac vice, on behalf of the Washington Legal Foundation and the Allied Educational Foundation, amici curiae.*

BRADY, Justice.

The issues presented by the instant case concern the constitutionality and applicability of N.C.G.S. § 1D-25, a statute which limits the amount of punitive damages recoverable in civil actions. We con-

clude that N.C.G.S. § 1D-25 is not violative of the North Carolina Constitution and applies to limit recovery of punitive damages per each plaintiff, even where multiple plaintiffs are joined together in one suit. Accordingly, we affirm the opinion of the North Carolina Court of Appeals.

The action underlying the issues before this Court arose out of an incident between plaintiffs Dan and Alice Rhyne and defendants Shawn Roberts and James Hoyle, security employees for defendant K-Mart Corporation (K-Mart). On or about 28 April 1998, K-Mart employees confronted plaintiffs as the couple was walking near a K-Mart retail store in Gaston County, North Carolina. Roberts, one of the employees, inquired of plaintiffs as to whether they had been rummaging through K-Mart's dumpsters. Mr. Rhyne responded that plaintiffs had not touched the dumpsters and were walking for exercise purposes only.

The following day, plaintiffs were again walking in the store's parking lot when they were approached by Roberts and Hoyle. This time, Roberts grabbed Mr. Rhyne, placed him in a choke-hold, and forced him to the ground. As Mrs. Rhyne attempted to assist her husband, who was at that time struggling to break free from Roberts, Hoyle pushed Mrs. Rhyne to the ground.

When two Gastonia police officers arrived on the scene approximately fifteen to twenty minutes later, K-Mart personnel informed the officers that the corporation would be pressing trespassing charges against both plaintiffs. However, K-Mart later pressed charges only against Mr. Rhyne for two counts of assault. Those charges were subsequently dismissed. As a result of the incident, plaintiffs sought and received medical attention for various physical and psychological ailments. Mr. Rhyne sustained a total of $5,376.12 in medical bills and lost wages, while Mrs. Rhyne sustained a total of $13,582.40 in medical bills.

On 31 December 1998, plaintiffs filed a civil action against K-Mart, Roberts, and Hoyle. Plaintiffs sought compensatory and punitive damages for assault, battery, slander, false imprisonment or unlawful detention, malicious prosecution, intentional infliction of emotional distress, and negligent infliction of emotional distress. Plaintiffs further alleged claims against K-Mart for negligence based upon premises liability and negligent supervision and training of employees.

RHYNE v. K-MART CORP.

[358 N.C. 160 (2004)]

Upon defendants' motion pursuant to N.C.G.S. § 1D-30, the trial was bifurcated. In the first phase of trial, the jury considered the issues of liability and compensatory damages. The jury found Hoyle not liable, and although the jury found Roberts liable, plaintiffs voluntarily dismissed with prejudice all claims against him. Regarding K-Mart, the jury returned a verdict finding that the corporation, through its agent Roberts, falsely imprisoned or unlawfully detained plaintiffs, inflicted intentional emotional distress on plaintiffs, maliciously prosecuted Mr. Rhyne, and negligently injured both plaintiffs. The jury awarded compensatory damages to Mr. Rhyne in the amount of $8,255.00, which included $1,790.00 in legal expenses he incurred as a result of the assault prosecutions. The jury awarded compensatory damages to Mrs. Rhyne in the amount of $10,730.00.

In the second phase of trial, the jury considered the issue of punitive damages. Upon hearing the evidence and considering those factors listed in N.C.G.S. § 1D-35, the jury found that each plaintiff was entitled to an award of punitive damages in the amount of $11.5 million. After the jury returned its verdict, the trial court reviewed the punitive damages awards and concluded that they were not grossly excessive and, therefore, did not violate K-Mart's due process rights as guaranteed by the United States Constitution. The statute at issue in the present appeal, N.C.G.S. § 1D-25, instructs trial courts to reduce awards of punitive damages to an amount that is three times the compensatory damages award or $250,000.00, whichever amount is greater. Pursuant to that statute, the trial court reduced the amount awarded each plaintiff to $250,000.00. Plaintiffs filed a motion to have N.C.G.S. § 1D-25 declared unconstitutional, and the trial court denied plaintiffs' motion.

Plaintiffs and K-Mart appealed to the North Carolina Court of Appeals. A divided panel of that court concluded that N.C.G.S. § 1D-25 was constitutional under the North Carolina Constitution and that the trial court correctly applied the statute by reducing each plaintiff's award to $250,000.00. *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672, 562 S.E.2d 82 (2002). The majority further concluded that awarding each plaintiff $250,000.00 was not grossly excessive and, therefore, did not violate the Due Process Clause of the United States Constitution. *Id.* at 689, 562 S.E.2d at 94. The dissent disagreed with the majority concerning the constitutionality of N.C.G.S. § 1D-25, concluding instead that N.C.G.S. § 1D-25 was constitutionally overbroad in that it infringed upon plaintiffs' right to trial by jury and that the statute violated Article I, Section 19 of the North Carolina

**RHYNE v. K-MART CORP.**

[358 N.C. 160 (2004)]

Constitution. *Id.* at 701, 562 S.E.2d at 101 (Greene, J., dissenting). The dissent nonetheless concluded that the amount of punitive damages awarded to plaintiffs by the jury was grossly excessive and, therefore, violated K-Mart's due process rights as guaranteed by the United States Constitution. *Id.* at 701, 562 S.E.2d at 101-02 (Greene, J., dissenting).

The case is now before this Court pursuant to plaintiffs' notice of appeal based on the dissenting opinion and substantial constitutional questions, as well as K-Mart's petition for discretionary review of an additional issue regarding the applicability of N.C.G.S. § 1D-25.

We will first address issues arising from plaintiffs' appeal. Punitive damages or exemplary damages, as they are sometimes called, hold "an established place" in North Carolina common law. *Hinson v. Dawson,* 244 N.C. 23, 27, 92 S.E.2d 393, 396 (1956); *see also Carruthers v. Tillman,* 2 N.C. 501 (1797) (reporting the first case where this Court discussed an award of exemplary damages). "Punitive damages are awarded on grounds of public policy." *Osborn v. Leach,* 135 N.C. 628, 633, 47 S.E. 811, 813 (1904). North Carolina courts have consistently awarded punitive damages "solely on the basis of [their] policy to punish intentional wrongdoing and to deter others from similar behavior." *Newton v. Standard Fire Ins. Co.,* 291 N.C. 105, 113, 229 S.E.2d 297, 302 (1976); *see also Watson v. Dixon,* 352 N.C. 343, 348, 532 S.E.2d 175, 178 (2000); *Oestreicher v. American Nat'l Stores, Inc.,* 290 N.C. 118, 134, 225 S.E.2d 797, 807-08 (1976). "Punitive damages are *never* awarded as compensation. They are awarded above and beyond actual damages, as a punishment for the defendant's intentional wrong." *Overnite Transp. Co. v. International Bhd. of Teamsters,* 257 N.C. 18, 30, 125 S.E.2d 277, 286 (emphasis added), *cert. denied,* 371 U.S. 862, 9 L. Ed. 2d 100 (1962). Prior to 1996, North Carolina juries determined the amount of punitive damages constrained only by the trial court's ability to order a new trial where the award was determined to be excessive or inadequate and "given under the influence of passion or prejudice," N.C.G.S. § 1A-1, N.C. R. Civ. P. 59(a)(6) (1983), or where the award did not satisfy principles of due process as guaranteed by the United States Constitution, *see generally Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 113 L. Ed. 2d 1 (1991).

In 1995, our General Assembly modified the common law as it pertained to punitive damages by enacting Chapter 1D of the North Carolina General Statutes, the statutory scheme now governing the

standards and procedures for awarding punitive damages in this state. Act of July 29, 1995, ch. 514, sec. 1, 1995 N.C. Sess. Laws 1825, 1825-28 (codified as N.C.G.S. § 1D-1 to -50 (2003)). Chapter 1D reinforces the common-law purpose behind punitive damages by providing that they are to be awarded "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C.G.S. § 1D-1. The statutory scheme tracks the common-law standards for awarding punitive damages by mandating that a plaintiff must prove certain aggravating factors to be entitled to an award of punitive damages, those factors being fraud, malice, or willful or wanton conduct. *See* N.C.G.S. § 1D-15(a). Section 1D-35 provides that, in determining the amount of the punitive damages award, the trier of fact "[s]hall" consider the purpose behind punitive damages and "[m]ay" consider evidence relating to an exclusive list of factors contained in N.C.G.S. § 1D-35(2). N.C.G.S. § 1D-35.

The statute at issue in the present case, N.C.G.S. § 1D-25, represents a departure from North Carolina common law by limiting the amount of punitive damages plaintiffs may recover. This limitation or ceiling operates as follows:

(a) In all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages.

(b) Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

(c) The provisions of subsection (b) of this section shall not be made known to the trier of fact through any means, including voir dire, the introduction into evidence, argument, or instructions to the jury.

N.C.G.S. § 1D-25. Chapter 1D became effective on 1 January 1996. Ch. 514, sec. 5, 1995 N.C. Sess. Laws at 1828.

At the outset, we observe that "this Court gives acts of the General Assembly great deference, and a statute will not be declared unconstitutional under our Constitution unless the Constitution clearly prohibits that statute." *In re Spivey*, 345 N.C. 404, 413, 480

S.E.2d 693, 698 (1997). Accordingly, there is a strong presumption that the statute at issue is constitutional. *Stephenson v. Bartlett*, 355 N.C. 354, 362, 562 S.E.2d 377, 384 (2002).

[1] With these principles in mind, we turn to examine whether N.C.G.S. § 1D-25 violates the constitutionally mandated separation of powers doctrine. The Separation of Powers Clause of our state Constitution provides: "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. In tandem with Article I, Section 6, the North Carolina Constitution mandates that "[t]he General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a coordinate department of the government." N.C. Const. art. IV, § 1. Thus, our Constitution shields the judicial branch " 'from legislative interference, so far at least as its inherent rights and powers are concerned.' " *In re Alamance County Court Facilities*, 329 N.C. 84, 93, 405 S.E.2d 125, 129 (1991) (quoting *Ex parte McCown*, 139 N.C. 95, 107, 51 S.E. 957, 962 (1905)).

Plaintiffs contend that by imposing a limit on punitive damages, the General Assembly has unconstitutionally interfered with the trial court's inherent authority to reduce jury verdicts on punitive damages, where the court determines, on a case-by-case basis, that those verdicts are excessive. This trial court function is known as remittitur. The fallacy in plaintiffs' argument is twofold. First, under North Carolina law, a trial court's power to remit damages is not necessarily inherent, as the exercise of that power is specifically authorized and limited by Rule 59(a)(6) of the North Carolina Rules of Civil Procedure. *See* N.C.G.S. § 1A-1, N.C. R. Civ. P. 59(a)(6) (2003) (providing that the trial court can *order a new trial* where it determines that damages are excessive or inadequate). Our Rules of Civil Procedure are not judicially imposed rules of court. They are enacted by our General Assembly as a part of our North Carolina General Statutes. Second, N.C.G.S. § 1D-25 does not operate as a "legislative remittitur." Unlike remittitur, section 1D-25 does not grant the General Assembly the authority to remit excessive awards on a case-by-case basis. Rather, by enacting section 1D-25, the General Assembly has imposed a limit on the recovery of punitive damages *in all cases*. This function is wholly distinct from that within the trial court's authority to apply fixed laws to individual controversies. *See State ex rel. Lanier v. Vines*, 274 N.C. 486, 495, 164 S.E.2d 161, 166 (1968). With a few exceptions, the majority of courts in other states

examining this issue have determined that legislative limitations on damages do not act as a type of "legislative remittitur" or otherwise infringe on a trial court's constitutional authority. *See, e.g., Gourley ex rel. Gourley v. Nebraska Methodist Health Sys., Inc.*, 663 N.W.2d 43, 77 (Neb. 2003) (per curiam); *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1055 (Alaska 2002); *Estate of Verba v. Ghaphery*, 552 S.E.2d 406, 411 (W. Va. 2001) (per curiam); *Kirkland ex rel. Kirkland v. Blaine County Med. Ctr.*, 134 Idaho 464, 471, 4 P.3d 1115, 1122 (Idaho 2000); *Guzman v. St. Francis Hosp., Inc.*, 240 Wis. 2d 559, 579, 623 N.W.2d 776, 786 (Wis. Ct. App. 2000); *see also Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 101, 376 S.E.2d 525, 532 (1989) (concluding that a ceiling on medical malpractice damages "was a proper exercise of legislative power" and therefore did not violate the separation of powers doctrine). *But see Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 415, 689 N.E.2d 1057, 1081 (1997) (declaring that a statutory limitation on damages was unconstitutional because it interfered with the court's inherent power to remit damages); *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 654, 771 P.2d 711, 721 (stating in *dicta* that "[a]lthough we do not decide the case on this basis, the [damages] limit *may*, indeed, violate the separation of powers") (emphasis added), *modified* 780 P.2d 260 (Wash. 1989).

As noted above, punitive damages hold "an established place" in North Carolina common law. *Hinson*, 244 N.C. at 27, 92 S.E.2d at 396. Nonetheless, it is well settled that North Carolina common law "may be modified or repealed by the General Assembly, except [for] any parts of the common law which are incorporated in our Constitution." *Gwathmey v. State ex rel. Dep't of Env't, Health, & Natural Res.*, 342 N.C. 287, 296, 464 S.E.2d 674, 679 (1995); *see also Pinkham v. Unborn Children of Jather Pinkham*, 227 N.C. 72, 78, 40 S.E.2d 690, 694 (1946) (noting that litigants do not have a right to the continuation of the common law).

The legislative branch of government is without question "the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, the statute supplants the common law rule and becomes the public policy of the State in respect to that particular matter." *McMichael v. Proctor*, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956), *quoted in Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 444, 302 S.E.2d 868, 882 (1983). The General Assembly is the "policy-making agency" because it is a far more appropriate forum than the courts for implementing policy-based changes to our laws. This Court has continually

acknowledged that, unlike the judiciary, the General Assembly is well equipped to weigh " 'all the factors surrounding a particular problem,' " *Tetterton v. Long Mfg. Co.*, 314 N.C. 44, 58, 332 S.E.2d 67, 75 (1985) (quoting *Kennedy v. Cumberland Eng'g Co.*, 471 A.2d 195, 206 (R.I. 1984) (Murray, J., dissenting)), "balanc[e] competing interests," *id.*, "provide an appropriate forum for a full and open debate," *Azzolino v. Dingfelder*, 315 N.C. 103, 116, 337 S.E.2d 528, 537 (1985), *cert. denied*, 479 U.S. 835, 93 L. Ed. 2d 75 (1986), and "address all of the issues at one time," *id. See generally State v. Warren*, 252 N.C. 690, 696, 114 S.E. 2d 660, 666 (1960) (noting that "[t]he legislative department is the judge, within reasonable limits, of what the public welfare requires, and the wisdom of its enactments is not the concern of the courts"); *see also* Victor E. Schwartz, Mark A. Behrens, & Monica G. Parham, *Fostering Mutual Respect and Cooperation Between State Courts and State Legislatures: A Sound Alternative to a Tort Tug of War*, 103 W. Va. L. Rev. 1, 11 (2000) ("[L]egislatures have certain tools that make them uniquely well situated to reach fully informed decisions about the need for broad public policy changes in the law."). Included in the General Assembly's preeminent role in modifying the common law on the basis of policy concerns is its "power to define the circumstances under which a remedy is legally cognizable and those under which it is not." *Lamb*, 308 N.C. at 444, 302 S.E.2d at 882.

Section 1D-25 does not represent an impermissible interference with the judiciary's constitutionally defined authority because our Constitution neither expressly nor implicitly empowers our courts to award punitive damages or to remit excessive awards thereof. Rather, because "[p]unitive damages are awarded on grounds of public policy," *Osborn*, 135 N.C. at 633, 47 S.E. at 813, section 1D-25 is a modification of the common law within the General Assembly's policy-making authority to define legally cognizable remedies. In fact, a century ago, this Court concluded that the General Assembly had the power to abolish the recovery of punitive damages in certain libel actions because, unlike actual or compensatory damages, plaintiffs had no right to the recovery of those damages. *Id.* Although no North Carolina case speaks directly to this issue, we are persuaded by cases from other jurisdictions holding that if the legislative branch can abolish plaintiffs' right to recover punitive damages altogether, a right which has not vested and is not guaranteed by the state Constitution, it can surely place limitations on the recovery of punitive damages. *See, e.g., Gourley*, 663 N.W.2d at 75 ("If the Legislature has the constitutional power to abolish a cause of action, it also has

the power to limit recovery in a cause of action."); *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1336 (D. Md. 1989) (same); *see also Dunham v. Anders,* 128 N.C. 207, 210, 38 S.E. 832, 833 (1901) (providing that the General Assembly can destroy rights until they become vested).

Furthermore, the General Assembly has similarly modified other portions of our common law without violating the North Carolina Constitution. For example, the General Assembly has created new causes of action, *see, e.g.*, N.C.G.S. § 50-20 (2003) (allowing for equitable distribution of marital property), limited liability by enacting statutes of repose, *see, e.g.*, N.C.G.S. § 1-50(a)(5), (a)(6) (2003) (providing a six-year statute of repose for causes of action regarding defective and unsafe improvements to real property and products liability); *Tetterton*, 314 N.C. 44, 332 S.E.2d 67 (holding that it was within the province of the General Assembly to pass a statute of repose as to products liability actions); *Lamb*, 308 N.C. 419, 302 S.E.2d 868 (concluding the same as to suits concerning the liability of construction industry professionals for defective and unsafe conditions of improvements to real property), and expanded available remedies by allowing for treble damages, *see, e.g.*, N.C.G.S. § 1-538 (2003) (providing for treble damages in cases of waste to land). We agree with the Nebraska and Idaho Supreme Courts:

> "Because it is properly within the power of the legislature to establish statutes of limitations, statutes of repose, create new causes of action, and otherwise modify the common law without violating separation of powers principles, it necessarily follows that the legislature also has the power to limit remedies available to plaintiffs without violating the separation of powers doctrine."

*Gourley*, 663 N.W.2d at 76-77 (quoting *Kirkland*, 134 Idaho at 471, 4 P.3d at 1122).

Moreover, the legislative branch is also the *only* branch of government which, within constitutional limits, defines and determines the range of punishment for crimes. *State v. Perry*, 316 N.C. 87, 101, 340 S.E.2d 450, 459 (1986) ("[T]he General Assembly and not the judiciary determines the minimum and maximum punishment which may be imposed on those convicted of crimes."); *see also Jernigan v. State*, 279 N.C. 556, 564, 184 S.E.2d 259, 265 (1971) (concluding that the General Assembly " 'alone can prescribe the punishment for crime' ") (quoting *Commonwealth ex rel. Banks v. Cain*, 345 Pa. 581, 587, 28 A.2d 897, 900 (1942)). Because punitive damages

are awarded to punish and deter defendants and "[l]egislatures have extremely broad discretion in defining criminal offenses," it necessarily follows that legislatures also "enjoy broad discretion in authorizing and limiting permissible punitive damages awards." *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 149 L. Ed. 2d 674, 684 (2001).

For the reasons stated above, we conclude that section 1D-25 does not violate the Separation of Powers Clause of the North Carolina Constitution.

**[2]** We next address plaintiffs' argument that N.C.G.S. § 1D-25 violates their right to a trial by jury as guaranteed by the North Carolina Constitution. Article I, Section 25 of the North Carolina Constitution provides as follows: "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and shall remain sacred and inviolable." N.C. Const. art. I, § 25; *see also* N.C. Const. of 1868, art. I, § 19 ("In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable."); N.C. Const. of 1776, Declaration of Rights § 14 (same). Article 1, Section 25 "addresses the substantive constitutional right to trial by jury in civil cases in almost the exact language found in the original Constitution of 1776." *Kiser v. Kiser*, 325 N.C. 502, 507, 385 S.E.2d 487, 489 (1989). The right to trial by jury now applies to actions at law and in equity. *Id.*

This Court has previously held that the right to trial by jury applies "only to actions respecting property in which the right to jury trial existed either at common law or by statute at the time of the adoption of the 1868 Constitution." *State ex rel. Rhodes v. Simpson*, 325 N.C. 514, 517, 385 S.E.2d 329, 331 (1989). Thus, the constitutional right to trial by jury does not apply "where the right and the remedy with it are thereafter created by statute." *Groves v. Ware*, 182 N.C. 553, 558, 109 S.E. 568, 571 (1921).

It is well established that North Carolina juries have been awarding punitive damages since a time prior to the ratification of the Constitution of 1868. *See, e.g., Pendleton v. Davis*, 46 N.C. 98, 99 (1853) (noting that the jury was "at liberty to give exemplary damages"); *Gilreath v. Allen*, 32 N.C. 67, 69 (1849) (stating that the jury could award exemplary damages where there existed aggravating circumstances); *Wylie v. Smitherman*, 30 N.C. 236, 239 (1848) (holding that where the tort of "trespass is committed wantonly or

maliciously, [then] the jury may, if [it] think[s] proper, give vindictive damages"). Furthermore, juries were awarding punitive damages prior to 1868 in all but one of the claims for which plaintiffs received punitive damages in the instant case, that claim being intentional infliction of emotional distress. *See Bradley v. Morris*, 44 N.C. 395, 397 (1853) (noting that exemplary damages could be awarded in a cause of action for malicious prosecution); *Sawyer v. Jarvis*, 35 N.C. 179, 181 (1851) (indicating that the jury was to increase an award in a case of false imprisonment by giving exemplary damages). *But compare Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992) ("This Court first discussed the tort of intentional infliction of emotional distress in *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979).").

Plaintiffs contend that because juries were awarding punitive damages prior to the adoption of the Constitution of 1868, the Court of Appeals erred in determining that the right did not apply to plaintiffs' action for punitive damages because an action for punitive damages is not a controversy respecting property. If this Court were to adopt plaintiffs' argument, however, the "respecting property" phrase contained in Article I, Section 25 is mere surplusage. We cannot agree with this reasoning.

As recently as last year, this Court reiterated that "[u]nder the North Carolina Constitution, a party has a right to a jury trial in 'all controversies at law respecting property.'" *Dockery v. Hocutt*, 357 N.C. 210, 217, 581 S.E.2d 431, 436 (2003) (quoting N.C. Const. art I, § 25). We acknowledge that in the majority of our cases, particularly in recent years, this Court has concluded that there was or was not a right to a trial by jury based upon whether the right did or did not exist prior to 1868. In these cases, the Court did not discuss the "respecting property" requirement outside of a simple recitation of the relevant constitutional provision. As noted by the dissenting Court of Appeals' judge, in some of these cases, the subject matter of the causes of action clearly concerned property, but the right to a trial by jury simply did not exist prior to 1868; therefore, it was unnecessary for the Court to reach the issue of whether the controversy therein respected property. *See, e.g., Simpson*, 325 N.C. 514, 385 S.E.2d 329 (concluding that litigants whose private property was subject to restrictions pursuant to certain environmental legislation were not entitled to a trial by jury in an action to enforce the restrictions because that action did not exist at common law or by statute prior to 1868); *In re Annexation Ordinance Adopted by City of*

*Charlotte,* 284 N.C. 442, 202 S.E.2d 143 (1974) (holding the same regarding an action as to the annexation of private property); *Kiser,* 325 N.C. 502, 385 S.E.2d 487 (concluding the same as to equitable distribution actions); *Kaperonis v. North Carolina State Highway Comm'n,* 260 N.C. 587, 133 S.E.2d 464 (1963) (holding the same regarding a statutory action allowing litigants to seek damages when their property is taken for government purposes).

Admittedly, there are other cases where the subject matter clearly did not involve property, but this Court likewise disposed of the matter by determining that the litigants did not have a constitutional right to a jury trial because that right did not exist prior to 1868. *See, e.g., In re Clark,* 303 N.C. 592, 281 S.E.2d 47 (1981) (concluding that the right to trial by jury did not exist in an action for termination of parental rights because the action did not exist prior to 1868). Despite plaintiffs' contentions to the contrary, none of these cases, or any other cases for that matter, expressly disavowed the "respecting property" language as it plainly appears in our Constitution.

More importantly, when the most recent, extensive editorial revisions to our Constitution were adopted in 1970, the language that plaintiffs now argue is arcane was not deleted from the Constitution. In previously examining the 1970 revisions, this Court noted that "the new document enacted in 1970, of which Article I, § 25 is a part, was not a fundamentally new constitution. It was an extensive editorial revision of the 1868 document. The evils sought to be remedied were obsolete language, outdated style and illogical arrangement." *North Carolina State Bar v. DuMont,* 304 N.C. 627, 636, 286 S.E.2d 89, 95 (1982). If the "respecting property" phrase was arcane and meaningless, it would logically have been deleted as a part of the 1970 editorial revisions to the North Carolina Constitution. Accordingly, we do not agree with plaintiffs' argument that the "respecting property" language of Article I, Section 25 is mere surplusage and that determining whether a right to a trial by jury exists should *only* involve an examination of whether punitive damages were awarded prior to 1868.

Plaintiffs further argue that even if the "respecting property" language has meaning, the term "property" is such a broad concept that it encompasses their right to seek punitive damages. Again, we do not agree. We recognize, as plaintiffs point out, that some of the language contained in *Smith v. Campbell,* 10 N.C. 590 (1825), the case relied upon by the Court of Appeals to conclude that an action for punitive

damages does not violate plaintiffs' jury trial right, defined the "respecting property" provision of a predecessor to Article I, Section 25 very narrowly. *See Smith*, 10 N.C. at 597 (concluding that a controversy concerning a debt was not one respecting property because, among other reasons, a person has *"property* in a *thing* only"). A review of the relevant case law and commentary suggests that much of the holding in *Smith* should be limited to the specific set of circumstances presented by that case. *See Froelich v. Southern Express Co.*, 67 N.C. 1, 7 (1872) (indicating that in *Smith,* the Court concluded that the constitutional right to trial by jury did not apply "to contracts like those embraced by the several statutes giving jurisdiction to single Justices of the Peace") (emphasis added); Atwell Campbell McIntosh, *North Carolina Practice and Procedure in Civil Cases* § 540, at 585 (1929) [hereinafter *McIntosh's Practice & Procedure*] (noting that this Court in *Smith* held that a debt was not property "to increase the jurisdiction of a justice of the peace"). Thus, some of the reasoning in *Smith* regarding the meaning of "property" does, as plaintiffs suggest, represent an exception to what has been otherwise defined as a broader concept. John V. Orth, *The North Carolina State Constitution: A Reference Guide* 68 (1993) [hereinafter *Orth's North Carolina Constitution*] (noting that " '[p]roperty,' as used in [Article I, Section 25], is defined expansively"); *McIntosh's Practice & Procedure* § 540, at 585 (indicating that "[u]nder the present practice the words [of the predecessor to Article 1, Section 25] are given a more liberal construction").

However, the Court in *Smith* was correct in inferring that the phrase "respecting property" is not "useless and vain." 10 N.C. at 597. As this Court recognized in 1872, the jury trial right guaranteed by the North Carolina Constitution has not been allowed to have a "sweeping effect." *Froelich*, 67 N.C. at 7. "The word 'property' is not such a technical one that if properly used it has everywhere the same precise and definite meaning. Its meaning varies according to the subject treated . . . and according to the context." *Wilson v. Board of Aldermen of Charlotte*, 74 N.C. 748, 755 (1876); *see also* 1 *Valuation and Distribution of Marital Property* § 18.02[1], at 18-11 (2003) (noting after review of differing definitions of the general meaning of property, that "[t]he ultimate conclusion, then, is that 'property' is elusive in definition and appears to be a set of legal rights which the courts, in consideration of public policy, have determined to protect"). "Property," as used in Article 1, Section 25, and its similarly worded predecessors, has been defined by this Court as "embrac[ing]

everything which a man may have exclusive dominion over." *Wilson*, 74 N.C. at 756; *see also Orth's North Carolina Constitution*, at 68. This Court similarly noted in 1872 that "[i]n all actions where *legal rights* are involved, and issues of fact are joined by the pleadings, the plaintiff is entitled to a trial by jury." *Andrews v. Pritchett*, 66 N.C. 387, 388 (1872) (emphasis added).

Although Article I, Section 25 appears to embody a broad definition of the term "property," a controversy in which punitive damages are assessed is not one which enforces a plaintiff's legal rights and, therefore, does not respect property. Without question, vested rights of action are property, just as tangible things are property. *Duckworth v. Mull*, 143 N.C. 461, 466-67, 55 S.E. 850, 852 (1906). " 'A right to sue for *an injury* is a right of action; it is a thing in action, and is property.' " *Id.* at 467, 55 S.E. at 852 (quoting *Chicago, Burlington & Quincy R.R. v. Dunn*, 52 Ill. 260, 264 (1869)) (emphasis added). However, an entitlement to an award of punitive damages does not represent a right vested in a plaintiff. A plaintiff's recovery of punitive damages is fortuitous, as such damages are assessed *solely* as a means to punish the willful and wanton actions of defendants and, unlike compensatory damages, do not vest in a plaintiff upon injury. *See Overnite*, 257 N.C. at 30, 125 S.E.2d at 286 (noting that punitive damages are *"never* awarded as compensation") (emphasis added).

This Court addressed the distinction between compensatory damages, which represent a type of property interest vesting in plaintiffs, and punitive damages, which do not, in *Osborn*, 135 N.C. 628, 47 S.E. 811. The Court in *Osborn* examined the constitutionality of a North Carolina act commonly known as " 'London Libel Law.' " This act restricts a plaintiff's recovery for claims of libel to actual or compensatory damages where the defendant, a newspaper or periodical, proves that the libelous information at issue was published in good faith and prints a timely retraction. *Id.* at 631, 47 S.E. at 812. Although the Court in *Osborn* was concerned with the Open Courts Clause of the state Constitution rather than the right to trial by jury, the Court's conclusions as to the nature of punitive damages provides insight into whether, under North Carolina law, punitive damages are to be considered "property." The Court in *Osborn* determined that the libel law was constitutional, even though it abolished a plaintiff's right to recover punitive damages. *Id.* at 632-33, 47 S.E. at 813 (concluding that "the act . . . can relieve a defendant only against a claim for [punitive] damages"). The Court noted, in *dicta,* that had the act restricted

RHYNE v. K-MART CORP.

[358 N.C. 160 (2004)]

the recovery of actual or compensatory damages, it would have been unconstitutional. *Id.* at 640, 47 S.E. at 815. In so doing, the Court concluded the following:

> Punitive damages are not included in what is termed actual or compensatory damages . . . . Punitive damages are awarded on grounds of public policy and not because the plaintiff has a *right* to the money, but it goes to him merely because it is assessed in his suit.
>
> The right to have punitive damages assessed is, therefore, not property. The right to recover actual or compensatory damages *is property*.
>
> . . . "The right to recover damages for an injury is a species of property and *vests* in the injured party immediately on the commission of the wrong. It is not the subsequent verdict and judgment but the commission of the wrong that gives the right. The verdict and judgment simply define its extent. Being property, it is protected by the ordinary constitutional guarantees."

*Id.* at 632-33, 47 S.E. at 813 (citations omitted) (quoting William B. Hale, *Handbook on the Law of Damages* § 2, at 2 (1896)).

Although this Court has not examined whether plaintiffs have a property right, or any other vested right for that matter, to an award of punitive damages since our decision in *Osborn*, other state courts have similarly concluded that plaintiffs have no property or other right in an award of punitive damages prior to judgment. *See, e.g., Cheatham v. Pohle*, 789 N.E.2d 467, 475 (Ind. 2003) (concluding that the statute allowing the state to recover part of a punitive damages award was not an unconstitutional taking under either the state or federal constitution because plaintiffs' prejudgment claim was not a property interest); *DeMendoza v. Huffman*, 334 Or. 425, 449, 51 P.3d 1232, 1246 (2002) (holding in relation to a challenge to a similar statute that the operation of the statute was not a taking because "plaintiffs do not have a vested prejudgment property right in punitive damages"); *Fust v. Attorney Gen.*, 947 S.W.2d 424, 431 (Mo. 1997) (same); *Gordon v. State*, 608 So. 2d 800, 801-02 (Fla. 1992) (" 'The right to have punitive damages assessed is not property; and it is the general rule that, until a judgment is rendered, there is no vested right in a claim for punitive damages.' ") (quoting *Ross v. Gore*, 48 So. 2d 412, 414 (Fla. 1950)), *cert. denied*, 507 U.S. 1005, 123 L. Ed. 2d 268 (1993); *Shepherd Components, Inc. v. Brice Petrides-Donohue &*

*Assocs., Inc.*, 473 N.W.2d 612, 619 (Iowa 1991) (concluding that "a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it," and plaintiff "did not have a vested right to punitive damages prior to the entry of a judgment"); *Smith v. Hill*, 12 Ill. 2d 588, 595, 147 N.E.2d 321, 325 (1958) (concluding that a plaintiff has no vested right to punitive damages); *Kelly v. Hall*, 191 Ga. 470, 472, 12 S.E.2d 881, 883 (1941) (same).

We are persuaded by *Osborn* and the above-noted decisions from other jurisdictions that plaintiffs have no independent right to, or "property" interest in, an award of punitive damages. As such, the jury's role in awarding punitive damages can be dictated by our state's policy-making body, the General Assembly, without violating plaintiffs' constitutional right to trial by jury.

Here, the incident for which plaintiffs sought punitive damages occurred in 1998, *two years after* the effective date of section 1D-25. Therefore, the rights plaintiffs possessed regarding the jury's role in awarding punitive damages were properly limited by Chapter 1D of our General Statutes. In arriving at an award in excess of the statutory maximum, the jury determined, without knowledge of N.C.G.S. § 1D-25, that plaintiffs were entitled to the maximum amount available. Prior to entry of judgment, the trial court reduced the jury awards pursuant to guidelines established by section 1D-25. The trial court did not, as plaintiffs contend, ignore the jury's decision but gave effect to it by imposing judgment in compliance with section 1D-25.[1]

---

1. Plaintiffs also argue in their brief that this Court should look to federal cases in determining whether a jury trial right exists in an action for punitive damages. Plaintiffs point out that in determining whether the right applies, federal courts only examine whether the right to trial by jury existed at the time the Seventh Amendment to the federal Constitution was ratified. Plaintiffs further note that other state courts examining their constitutions' jury trial right are also concerned only with whether the right existed at the time the provision guaranteeing the right was ratified. Plaintiffs' arguments do not support their position for several reasons. First, federal courts specifically examine the right to trial by jury as it exists via the Seventh Amendment, the text of which is not the same as Article I, Section 25. *Compare* U.S. Const. amend VII, *with* N.C. Const. art. I, § 25. Furthermore, the United States Supreme Court's most recent case examining the Seventh Amendment in the context of actions for punitive damages supports a position opposite to that of plaintiffs' position. *See Cooper*, 532 U.S. 424, 149 L. Ed. 2d 674. In *Cooper*, the United States Supreme Court held that an appellate court's *de novo* review of an award of punitive damages did not violate the Seventh Amendment. In so doing, the Court concluded that the amount of punitive damages was "an expression of [the jury's] moral condemnation," *id.* at 432, 149 L. Ed. 2d at 684, and " 'is not really a "fact" "tried" by the jury,' " *id.* at 437, 149 L. Ed. 2d at 687 (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 459, 135 L. Ed. 2d 659, 693 (1996) (Scalia, J., dissenting)). The Court concluded that because the amount of punitive damages awarded by the jury was not a finding of fact, *de novo*

We therefore hold that N.C.G.S. § 1D-25 in no way infringes upon plaintiffs' right to trial by jury as guaranteed by our state Constitution.

**[3]** We next address plaintiffs' assertion that the statutory limit on punitive damages constitutes an unconstitutional taking of property because plaintiffs were denied "the enjoyment of the fruits of their own labor" in not receiving the amount of punitive damages as awarded by the jury. N.C. Const. art. I, § 1. We note that Article I, Section 1 of our Constitution does not specifically guarantee to the citizens of North Carolina that their property will not be taken without just compensation. The North Carolina Constitution does not contain an express "taking" provision. This Court has, however, allowed taking challenges on the basis of constitutional and common-law principles, declaring that "[t]his principle is considered in North Carolina as an integral part of 'the law of the land' within the meaning of Article I, Section 19 of our State Constitution." *Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E.2d 101, 107-08 (1982) (quoting N.C. Const. art. I, § 19).

Plaintiffs' arguments are nonetheless without merit. For the same reasons stated above, the jury's verdict was not property in which plaintiffs enjoyed a vested right. Because the limitation on punitive damages applies prior to the entry of judgment, a point at which it could be argued that plaintiffs obtain a vested property right in the verdict, *see DeMendoza*, 334 Or. at 449, 51 P.3d at 1246 (holding that "plaintiffs do not have a vested prejudgment property right in punitive damages") (emphasis added); *see also Dunham*, 128 N.C. at 213, 38 S.E. at 834 (concluding that where a plaintiff obtained a judgment, he had obtained a vested property right that could not be divested by legislative interference), the ceiling on damages does not constitute an unconstitutional taking. Also, we cannot agree with plaintiffs' argument that they were deprived of the fruits of their own labor. Clearly, a litigant's participation in a trial is not "labor" nor is a jury's verdict the "fruits" of that labor. *Cf. Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 366 S.E.2d 697 (1988) (indicating that the state allegedly deprives plaintiffs of the fruits of their labor where the regulations and statutes at issue interfere with a plaintiff's business or other eco-

appellate review of an award did not implicate the right to trial by jury as guaranteed by the Seventh Amendment. *Id.* at 437, 149 L. Ed. 2d at 687-88. Moreover, if we were to follow plaintiffs' reasoning and look to cases from other state courts, we would find that the majority of those state courts has determined that limits on damages do not violate plaintiffs' right to a trial by jury. *See Gourley*, 663 N.W.2d at 75; *see also Evans*, 56 P.3d at 1051 n.28.

nomic enterprise); *North Carolina Real Estate Licensing Bd. v. Aikens*, 31 N.C. App. 8, 228 S.E.2d 493 (1976) (noting that the constitutional right to enjoy the fruit of one's labor protects the right to pursue one's occupation). As such, plaintiffs' contentions that the legislative limitation on punitive damages represents an unconstitutional taking and that they were deprived of the fruits of their labor must fail.

**[4]** We next consider whether the legislative ceiling on punitive damages violates principles of due process and equal protection as guaranteed by the North Carolina Constitution. Article I, Section 19 of the North Carolina Constitution guarantees both due process rights and equal protection under the law by providing that no person shall be "deprived of his life, liberty, or property, but by the law of the land" and that "[n]o person shall be denied the equal protection of the laws." N.C. Const. art. I, § 19. "The term 'law of the land' as used in Article I, Section 19, of the Constitution of North Carolina, is synonymous with 'due process of law' as used in the Fourteenth Amendment to the Federal Constitution." *In re Moore*, 289 N.C. 95, 98, 221 S.E.2d 307, 309 (1976).

When a party challenges a particular statute as violative of the Equal Protection Clause of the North Carolina Constitution, we generally evaluate that legislation using one of two levels of review. *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n*, 336 N.C. 657, 681, 446 S.E.2d 332, 346 (1994). If the statute at issue affects the exercise of a fundamental right or classifies a person based upon a suspect characteristic, we apply strict scrutiny. *Id.* On the other hand, if the statute impacts neither a fundamental right nor a suspect class, we employ the rational basis test. *Richardson v. North Carolina Dep't of Corr.*, 345 N.C. 128, 135, 478 S.E.2d 501, 505 (1996).

As determined above, section 1D-25 does not infringe upon plaintiffs' fundamental right to a trial by jury or to be free from an unconstitutional taking, nor does it create a suspect classification, *see Dep't of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001) (defining suspect classifications), *cert. denied*, 534 U.S. 1130, 151 L. Ed. 2d 972 (2002). Accordingly, the rational basis test or rational basis review applies, and this Court must inquire whether "distinctions which are drawn by a challenged statute . . . bear *some* rational relationship to a conceivable legitimate governmental interest." *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980) (emphasis added). Rational basis review is

satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger v. Hahn*, 505 U.S. 1, 11, 120 L. Ed. 2d 1, 13 (1992) (citations omitted); *see also Carolina Util.*, 336 N.C. at 681-82, 446 S.E.2d at 346 ("With regard to the contention that the legislation does not bear a rational relationship to the ends sought, it has been held that the relationship need not be a perfect one.").

Principles of substantive due process dictate that "the law shall not be unreasonable, arbitrary or capricious, and that the law be substantially related to the valid object sought to be obtained." *State v. Joyner*, 286 N.C. 366, 371, 211 S.E.2d 320, 323, *appeal dismissed*, 422 U.S. 1002, 45 L. Ed. 2d 666 (1975). Similar to the rational basis test for equal protection challenges, "[a]s long as there could be some rational basis for enacting [the statute at issue], this Court may not invoke [principles of due process] to disturb the statute." *Lowe v. Tarble*, 313 N.C. 460, 462, 329 S.E.2d 648, 650 (1985); *see also In re Montgomery*, 311 N.C. 101, 115, 316 S.E.2d 246, 255 (1984) (noting that a statute does not violate principles of substantive due process if it has a "rational relation" to the state's exercise of its police powers).

Plaintiffs argue that section 1D-25 bears no substantial or rational relationship to any governmental interest because the need for legislative tort reform regarding punitive damages was unsubstantiated, as there was neither a nationwide nor statewide crisis when the statute was passed in 1995. In support of their argument, plaintiffs rely upon scholars who question the necessity of legislative limitations on punitive damages. Plaintiffs also point to evidence indicating that there is a low incidence of punitive damage awards in this state.

Plaintiffs' argument misapprehends the law regarding the rational basis standard of review. As noted above, the rational basis test is the lowest tier of review, requiring a connection between the statute and "a conceivable," *Texfi*, 301 N.C. at 11, 269 S.E.2d at 149, or "any," *Rowe*, 353 N.C. at 675, 549 S.E.2d at 207, legitimate governmental interest. Given the Legislature's responsibility in dictating the policy for this state and the deference shown to that branch of government by this Court in the implementation of that policy, the

General Assembly may permissibly anticipate problematic areas of the law such as excessive punitive damages awards. *See Lanier,* 274 N.C. at 495, 164 S.E.2d at 166 (noting that the General Assembly usually acts prospectively). The rational basis test reflects this judicial deference and, as such, does not require the governmental interest at issue to reach crisis proportions before legislative action can be taken.

Moreover, despite the evidence presented by plaintiffs that the rationality of section 1D-25 is questionable, "they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.' " *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 66 L. Ed. 2d 659, 669 (1981) (quoting *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 82 L. Ed. 1234, 1243 (1938)) (alteration in original). As suggested by K-Mart and *amici,* in enacting section 1D-25, the General Assembly could have been persuaded by arguments that N.C.G.S. § 1D-25 was necessary to preserve North Carolina's economic development, given the impact of punitive damages on a variety of industries; to assure public confidence in the judicial system; and to provide clear notice of possible penalty to defendants, whose property, as the result of a punitive damages award, will potentially be taken as a punishment without the protection of our criminal justice system. The General Assembly could have believed that these considerations bear some relationship to the curtailment of punitive damages awards.

Furthermore, these are issues with which the General Assembly could have been concerned when it enacted the statute in 1995. Prior to the passage of section 1D-25, other states had already enacted or were in the process of enacting limitations on a plaintiff's recovery of punitive damages, including statutory ceilings on punitive damages and split-recovery provisions, whereby a portion of a punitive damages award is allocated to the state. *See generally BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, app. at 614-19, 134 L. Ed. 2d 809, app. at 851-54 (1996) (Ginsberg, J., dissenting) (listing in an appendix states and corresponding legislation curtailing awards of punitive damages, including those that did so prior to the effective date of section 1D-25); Brian Timothy Beasley, Recent Development, *North Carolina's New Punitive Damages Statute: Who's Being Punished, Anyway?,* 74 N.C. L. Rev. 2174, app. at 2202-13 (1996) (listing what actions other states had taken regarding punitive damages at the time N.C.G.S. § 1D-25 was enacted). Several jurists had drawn attention to

and criticized the awarding of excessive punitive damages, most notably, members of the United States Supreme Court. For example, in *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 106 L. Ed. 2d 219 (1989), Justice O'Connor stated in her concurring opinion that "[a]wards of punitive damages are skyrocketing" and that "[t]he threat of such enormous awards has a detrimental effect on the research and development of new products." 492 U.S. at 282, 106 L. Ed. 2d at 242 (O'Connor, J., concurring in part and dissenting in part); *see also Honda Motor Co. v. Oberg*, 512 U.S. 415, 433 n.11, 129 L. Ed. 2d 336, 350 n.11 (1994) (noting that "over half of punitive damages awards were appealed, and that more than half of those appealed resulted in reductions or reversals of the punitive damages"). Moreover, in delivering the opinion of the Court in *Haslip*, Justice Blackmun expressed "concern about punitive damages that 'run wild,' " concluding that "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." 499 U.S. at 18, 113 L. Ed. 2d at 20.

The United States Supreme Court has continued to question the amount of punitive damages awards since the passage of section 1D-25, further confirming that the propriety of punitive damages awards was and continues to be debatable on a nationwide level. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 155 L. Ed. 2d 585 (2003) (concluding that a $145 million punitive damages award was excessive, where the ratio between punitive and compensatory damages was 145 to 1); *see also Philip Morris USA Inc. v. Williams*, —— U.S.——, 157 L. Ed. 2d 12 (2003) (vacating judgment and remanding for consideration in light of *State Farm*), *vacating*, 182 Or. App. 44, 48 P.3d 824 (2002) (concluding that a $79.5 million punitive damages award, which was ninety-seven times the compensatory damages award, was not excessive); *Ford Motor Co. v. Estate of Smith*, —— U.S. ——, 155 L. Ed. 2d 1056 (2003) (vacating and remanding for consideration in light of *State Farm*), *vacating sub nom. Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483 (Ky. 2002) (reinstating a trial court's reduction of a $20 million punitive damages award to $15 million, where the compensatory award was $3 million). Specifically, in *Gore*, the Court concluded that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." 517 U.S. at 574, 134 L. Ed. 2d at 826.

RHYNE v. K-MART CORP.

[358 N.C. 160 (2004)]

The concerns reflected in legislation from other states and the opinions of the United States Supreme Court indicate that the perceived need for limitations on punitive damages was at least debatable when the General Assembly chose to enact section 1D-25 in 1995. In fact, a review of the legislative history regarding the enactment of section 1D-25 indeed reflects that legitimate governmental interests suggested by K-Mart and *amici* may have been on the legislators' minds at the time the statute was passed and could have prompted them to act. Those interests include promoting public confidence in and bringing more certainty to our system of civil redress, shielding North Carolina from problems encountered in other states, and encouraging businesses to bring much needed employment and other economic resources to this state. *See* Minutes, *Meeting on H.B. 729 Before the Senate Judiciary I/Const. Comm.*, 1995 Gen. Assemb., Reg. Sess. (N.C. June 21, 1995) (remarks by Phillip J. Kirk, President, N.C. Citizens for Bus. & Indus.); Minutes, *Meeting on H.B. 636, 637, 729, 730, & 731 Before the House Select Comm. on Tort Reform*, 1995 Gen. Assemb., Reg. Sess. (N.C. Apr. 5, 1995) (comments by Rep. Charles B. Neely, Jr., Member, House Select Comm. on Tort Reform).

Furthermore, the monetary limits established by N.C.G.S. § 1D-25 are not arbitrary. The statute does not create a strict monetary limit but provides for recovery of punitive damages awards not more than three times the compensatory damages award or $250,000.00, whichever is greater.

In *State Farm*, the United States Supreme Court emphasized that although punitive damages awards "serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding," thus increasing the danger of an " 'arbitrary deprivation of property.' " 538 U.S. at ——, 155 L. Ed. 2d at 601 (quoting *Honda Motor*, 512 U.S. at 432, 129 L. Ed. 2d at 349)). In balancing a defendant's punishment with the harm done to plaintiffs, the Court declined to establish a "bright-line ratio" between punitive and compensatory damages but noted that "few awards exceeding a single-digit ratio . . . will satisfy due process" and that a ratio of more than four-to-one "might be close to the line of constitutional impropriety." *Id.* at ——, 155 L. Ed. 2d at 605-06. The Court further noted that there was a long legislative history of "providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id.* at ——, 155 L. Ed. 2d at 606. Thus, the scheme for limiting the punitive award con-

tained in N.C.G.S. § 1D-25, providing for three times the compensatory award, is in line with the standards suggested by the United States Supreme Court to prevent grossly excessive awards.

Because the limitation on punitive damages contained in N.C.G.S. § 1D-25 bears some rational relationship to several legitimate governmental interests, as reflected in the above-noted discussion, we conclude that section 1D-25 does not violate principles of due process and equal protection as guaranteed by our state Constitution. Plaintiffs' argument is therefore without merit.

[5] Plaintiffs next argue that North Carolina's statutory limitation on punitive damages violates the Open Courts Clause of our state Constitution. Article I, Section 18 of the North Carolina Constitution provides: "All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." N.C. Const. art. I, § 18; *accord* N.C. Const. of 1868, art. 1, § 35. Plaintiffs contend that section 1D-25 violates the above-noted constitutional provision because it does not afford them a proper and adequate remedy. We disagree.

We believe that this issue was resolved by this Court in *Osborn*, 135 N.C. 628, 47 S.E. 811. As discussed above, the Court in *Osborn* concluded that an act, known as the " 'London Libel Law,' " abolishing the recovery of punitive damages in certain libel actions, did not violate the Open Courts Clause of the North Carolina Constitution as it appeared in the Constitution of 1868. 135 N.C. at 631, 47 S.E. at 812. The Court based its holding on a plaintiff's lack of a right to recover punitive damages. *Id.* at 632-33, 47 S.E. at 813. Thus, according to *Osborn*, the Open Courts Clause does not prevent the General Assembly from abolishing the recovery of punitive damages altogether. It follows that the Open Courts Clause would not prevent the General Assembly from limiting awards of punitive damages.

Plaintiffs argue that awarding punitive damages, as dictated by section 1D-25, violates the Open Courts Clause because the remedy is meaningless in light of K-mart's ability to pay the award. In so arguing, plaintiffs rely upon a quotation from *Watson*, 352 N.C. 343, 532 S.E.2d 175, providing as follows: "[O]bviously, the function of deterrence[] will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928, 582 P.2d 980, 990 (1978) (footnote omitted), *quoted in Watson*, 352 N.C. at 349, 532 S.E.2d at 178.

Plaintiffs' reliance on *Watson* is misplaced. First, as discussed above, the Open Courts Clause is not implicated because plaintiffs do not have a right to recover punitive damages. *See Osborn*, 135 N.C. 628, 47 S.E. 811. Second, the Court in *Watson* was not concerned with a challenge to the Open Courts Clause. Rather, in *Watson*, the Court analyzed whether the punitive damages assessed against an employer should be limited to "the amount assessed against the employee whose tortious conduct the employer ratified." 352 N.C. at 348, 532 S.E.2d at 178.

Based upon this Court's decision in *Osborn*, we conclude that North Carolina's statutory limitation on punitive damages does not violate the Open Courts Clause of the North Carolina Constitution.

**[6]** We now address plaintiffs' final contention,[2] that N.C.G.S. § 1D-25 is unconstitutional because it is void for vagueness. In support of their contention, plaintiffs note that the trial court in the instant case recognized four possible interpretations as to the applicability of section 1D-25.

"[A] statute is unconstitutionally vague if it either: (1) fails to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited'; or (2) fails to 'provide explicit standards for those who apply [the law].' " *State v. Green*, 348 N.C. 588, 597, 502 S.E.2d 819, 824 (1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227 (1972)) (second alteration in original), *cert. denied*, 525 U.S. 1111, 142 L. Ed. 2d 783 (1999). The Constitution requires that the statute merely prescribe "boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly." *In re Burrus*, 275 N.C. 517, 531, 169 S.E.2d 879, 888 (1969), *aff'd*, 403 U.S. 528, 29 L. Ed. 2d 647 (1971). It is the plaintiffs' burden to show, in light of the circumstances of this case, that the statute is " 'incapable of uniform judicial administration.' " *In re Moore*, 306 N.C. 394, 402, 293 S.E.2d 127, 132 (1982) (quoting *In re Biggers*, 50 N.C. App. 332, 340, 274 S.E.2d 236, 241 (1981)), *appeal dismissed*, 459 U.S. 1139, 74 L. Ed. 2d 987 (1983).

---

2. In their notice of appeal to this Court, plaintiffs assign error to an additional issue—that N.C.G.S. § 1D-25 violates the North Carolina Constitution's prohibition against special legislation. However, plaintiffs do not address this issue in their appellant brief, but for a short tangential reference in a footnote. Because plaintiffs' brief fails to set out the above-noted assignment of error, a question presented referencing this alleged error, or any argument in support thereof, this issue is taken as abandoned. *See* N.C. R. App. P. 28(a), (b)(6).

**RHYNE v. K-MART CORP.**

[358 N.C. 160 (2004)]

However, "[i]mpossible standards of statutory clarity are not required by the constitution." *Burrus*, 275 N.C. at 531, 169 S.E.2d at 888. "Statutory language should not be declared void for vagueness unless it is not susceptible to reasonable understanding and interpretation." *State v. Jones*, 305 N.C. 520, 531, 290 S.E.2d 675, 681 (1982). Mere differences of opinion as to a statute's applicability do not render it unconstitutionally vague. *See Lowe v. Tarble*, 312 N.C. 467, 469, 323 S.E.2d 19, 21 (1984) (concluding that a statute "is not constitutionally suspect merely because it must be interpreted and applied in light of particular facts in a given case"). If so, as the Court of Appeals duly recognized, every statute which we are asked to decipher should be declared unconstitutional. Because we can, in our discussion below, apply the rules of statutory construction to discern a meaning from N.C.G.S. § 1D-25 that can be uniformly administered, we conclude that the statute is not unconstitutionally vague. *See Tetterton*, 314 N.C. at 55, 332 S.E.2d at 73 (finding that a particular statute was not unconstitutionally vague after applying "the normal rules of statutory construction" to arrive at its true meaning).

[7] Finally, we address K-Mart's petition for discretionary review as to an additional issue. K-Mart argues that the Court of Appeals misinterpreted section 1D-25(b). Subsection (b) provides as follows:

> Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

N.C.G.S. § 1D-25(b). The Court of Appeals concluded that section 1D-25(b) applied per plaintiff, such that each plaintiff should receive the greater of three times his individual compensatory damages award or $250,000.00. *Rhyne*, 149 N.C. App. at 687, 562 S.E.2d at 93. Because the trebling of each plaintiff's compensatory damages award resulted in an amount less than $250,000.00, the Court of Appeals determined that each plaintiff in the instant case should receive $250,000.00, requiring K-Mart to pay a total of $500,000.00 in punitive damages.

K-Mart argues that the punitive damages limitation should apply per defendant, such that it should be required to pay a total of $250,000.00 in punitive damages. According to K-Mart, a per-

defendant application is dictated by the plain meaning of the statute as it directs a trial court to reduce "[p]unitive damages awarded against *a defendant.*" N.C.G.S. § 1D-25(b) (emphasis added). We do not agree with K-Mart's argument.

The meaning of N.C.G.S. § 1D-25(b) is easily resolved through applying the well-established rules of statutory construction. A statute that is clear and unambiguous must be construed using its plain meaning. *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990). "But where a statute is ambiguous, judicial construction must be used to ascertain the legislative will." *Id.* at 209, 388 S.E.2d at 136-37.

K-Mart supports its argument that the punitive damages limitation applies per defendant by isolating one particular portion of section 1D-25(b)—that "[p]unitive damages awarded against *a defendant* shall not exceed" the amount specified therein. N.C.G.S. § 1D-25(b) (emphasis added). However, this Court does not read segments of a statute in isolation. Rather, we construe statutes *in pari materia,* giving effect, if possible, to every provision. *Dockery,* 357 N.C. at 219, 581 S.E.2d at 437.

The use of other singular terms in section 1D-25(b) suggests that the statute applies to reduce each plaintiff's individual punitive damages award. The second sentence of section 1D-25 refers to that which is to be reduced as "*a* verdict" and "*the* award." N.C.G.S. § 1D-25(b) (emphasis added). We acknowledge that when a jury returns multiple verdicts, it will, more than likely, submit one verdict sheet to the trial court. Furthermore, in our everyday parlance, we may refer to the verdict sheet as a verdict or declare that the jury has returned its verdict or a verdict. However, as the verdict sheet reflects in the case *sub judice,* the jury may actually return two separate punitive damages awards, as there are two distinct verdicts based upon causes of action for individual plaintiffs.

Here, the jury returned one verdict against K-Mart for Mr. Rhyne in the amount of $11.2 million and a separate verdict for Mrs. Rhyne in the same amount. Mr. and Mrs. Rhyne joined in one civil action to bring their claims, and K-Mart was, in essence, a separate defendant with respect to each plaintiff's action. Thus, reading N.C.G.S. 1D-25 in its entirety, as we must, the statute directs the trial court to reduce both the award for Mr. Rhyne and the award for Mrs. Rhyne and to enter judgment against K-Mart in the amount of $250,000.00 for each plaintiff.

**RHYNE v. K-MART CORP.**

[358 N.C. 160 (2004)]

This construction of section 1D-25(b) is further supported by the operation of other statutes within Chapter 1D. Most significantly, section 1D-15(a) directs the trier of fact to consider an exclusive list of aggravating factors when determining whether to award punitive damages. N.C.G.S. § 1D-15(a). In the absence of some legislative directive, it is assumed that the trier of fact should, as it did at common law, consider these factors as to each plaintiff's cause of action and not as to each defendant. It follows that, like section 1D-15(a), section 1D-25(b) applies to the individual jury verdict of each plaintiff.

Even if the first sentence of section 1D-25(b) renders the statute susceptible to more than one construction, the consequences of each construction are "potent factor[s] in its interpretation, and undesirable consequences will be avoided if possible." *Little v. Stevens*, 267 N.C. 328, 336, 148 S.E.2d 201, 207 (1966), *quoted in Buford v. General Motors Corp.*, 339 N.C. 396, 410, 451 S.E.2d 293, 301 (1994). "[C]ourts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense," *State ex rel. Comm'r of Ins. v. North Carolina Auto. Rate Admin. Office*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978), and "with full knowledge of prior and existing law," *State v. Benton*, 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970).

K-Mart's interpretation of section 1D-25(b) would surely result in at least one absurd consequence. In contravention of this Court's history of promoting judicial economy, *see, e.g., Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 16, 591 S.E.2d 870, 880 (2004); *Bockweg v. Anderson*, 333 N.C. 486, 491, 428 S.E.2d 157, 161 (1993); *State v. Watson*, 310 N.C. 384, 388, 312 S.E.2d 448, 452 (1984), savvy plaintiffs will surely be encouraged to bring multiple lawsuits if we were to adopt K-Mart's construction of N.C.G.S. § 1D-25. Such a result would directly contradict the purpose behind the North Carolina Rules of Civil Procedure regarding joinder of parties. These rules liberally permit plaintiffs to join in a single civil action where they assert "any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all parties will arise in the action." N.C.G.S. § 1A-1, N.C. R. Civ. P. 20(a) (2003); *see also Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974) ("The purpose of [Rule 20(a)] is to promote trial convenience and expedite the final determination of disputes, thereby

preventing multiple lawsuits."); *Woods v. Smith*, 297 N.C. 363, 367, 255 S.E. 174, 177 (1979) (noting that with a minor exception, "N.C. R. Civ. P. 20 is a close counterpart of Fed. R. Civ. P. 20"). We assume that when the General Assembly acts, it does so in accordance with other statutory provisions and rules, including the North Carolina Rules of Civil Procedure, and with knowledge of relevant decisions by this Court. Surely, the General Assembly did not intend the passage of N.C.G.S. § 1D-25 to encourage a proliferation of multiple punitive damages lawsuits. *See Bagley v. Shortt*, 261 Ga. 762, 763, 410 S.E.2d 738, 739 (1991) (noting the same where the court concluded, based upon a similar interpretation of a statute limiting punitive damages, that such interpretation "would encourage the splitting of causes of action with sophistry and quibble").

Given the obviously absurd consequences that would result from K-Mart's interpretation of section 1D-25, we conclude that the Court of Appeals correctly interpreted section 1D-25(b). As such, the trial court properly entered judgment ordering defendant to pay $250,000.00 to Mr. Rhyne and $250,000.00 to Mrs. Rhyne, for a total of $500,000.00.

For the reasons stated above, we hold that N.C.G.S. § 1D-25 does not violate the North Carolina Constitution and applies to limit the recovery of each plaintiff. We therefore affirm the decision of the North Carolina Court of Appeals.

AFFIRMED.